Case No. 19-5331, Committee on the Judiciary of the United States House of Representatives v. Donald S. McGahn, II Mr. Mopan, to the Attorney, Ms. Barbero, for the appellee Mr. Mopan, good morning Good morning, Your Honor May it please the Court The House Judiciary Committee seeks to assert an implied cause of action to enforce a subpoena to compel Mr. McGahn to testify regarding his duties as White House Counsel over the objection of the President of the United States. This interbranch dispute over institutional prerogatives bears no resemblance to the traditional cases or controversies that can be heard under Article III. Moreover, while Congress has purported to authorize Senate committees to sue to enforce certain subpoenas against non-federal officials, Congress itself has expressly carved out the authority of the Senate to enforce subpoenas against federal executive officials asserting executive prerogative objections. What does the Senate statute, how does that help us think about the constitutional issue, the disability issue? Well, so I think it does in two ways, Your Honor. First, we have a straight-up subject matter jurisdiction argument because of the Senate statute, but the second point is, if you rule for us on the argument that there's no statutory authority, no subject matter jurisdiction, the Court can avoid the serious constitutional questions presented by Article III. And, in fact, for that reason, even if you... Isn't that the more fundamental question, though? The Article III question? Look, both Article III standing and federal subject matter jurisdiction are jurisdictional questions. They're both very important, and they're both threshold grounds that have to be decided before you can reach the merits. But as between the two of them, there is not an order of priority. The courts have recognized that you can decide one or the other first. And principles of constitutional avoidance would suggest that if the court resolves the question on statutory grounds, it can defer for a later day to the serious constitutional question. Well, let me ask you about the serious constitutional question. After Reins, in your view, when may Congress or a chamber of Congress assert an institutional injury? We don't think they ever tend, Your Honor, but certainly not in a case where it's an asserted injury against the executive branch. We think that Reins reaffirmed the proposition that a dispute, an injury, only gives rise to an Article III controversy when it's the type of dispute that has traditionally been resolved in federal court. But, I mean, the Supreme Court has said there is such a thing as institutional injury, right? Only... You've got Coleman, you've got Arizona State Legislature... Only for state legislatures, and in both Reins... Why would that make a difference? Because of the separation of powers problem. There's serious separation of powers concerns with having a federal court resolve an inter-branch dispute. And this is laid out in great detail in Reins. Reins specifies that over history, there have been countless disputes between Congress and the President. And in none of those disputes have they been resolved through inter-branch litigation over a claim injury to official authority or power. The court went through examples like the President not suing over the Tenure of Office Act, and Congress not suing over pocket vetoes. After a long discussion about it, it's three pages in the discussion of Reins, and then only a 12-page opinion. After all of that, it culminates in the conclusion of Reins. And the conclusion of Reins is that while it might not be irrational to have a scheme in which courts heard those sort of disputes, it is obviously, the courts have obviously not... Here we have a rather straightforward claim of executive privilege, right? Doesn't the Nixon tapes case invite us to resolve this dispute? I don't think so, Your Honor, because what Reins makes clear is it's not sufficient that the legal issue, the merits issue, be the sort of issue that courts can resolve. In Reins, of course, the constitutionality of the Line Item Veto Act was a sort of question that courts can resolve. In fact, the Supreme Court resolved it the very next term in Clinton v. New York, and resolved it in favor of the unconstitutionality, the very claim that was made by the Congressman in Reins. So what Reins tells you is it's not sufficient that the merits question be subject to judicial resolution. The question for standing, of course, is whether the plaintiff is the proper party to bring that suit. And what Reins described after it went through the history that I just discussed, the conclusion of it was, while you could have schemes that resolve those sort of intervention disputes, it is not what we have traditionally done under Article III, where Article III courts exist to resolve, protect the rights of individual citizens, not to engage in an amorphous supervision of the government. So with Senate Select Committee and AT&T, those are our ventures into legislative standing. Are those wrongly decided? Well, so Senate Select Committee, there are different answers to each case. So Senate Select Committee, the court doesn't address Article III standing, so it's a drive-by. We do think that there was not Article III standing in that case. As to AT&T, it's a different case both in terms of its facts and its posture. So AT&T commenced in district court as a suit by the United States to sue a private company. That is, of course, a traditional case of controversy brought by the U.S. as sovereign to enforce its sovereign prerogatives, represented by the executive branch, the branch of this government that represents the United States in litigation. Yeah, but the reality of the case was that it was an interbranch dispute over information. So I don't think – it is certainly the case that the House intervened to defend its subpoena, but that doesn't change the fact that the nature of the dispute in district court was the United States – But the nature of the court's analysis was all about the interbranch dispute over information, and that's what we have here. That's the merits question, but in terms of the standing, in terms of whether there was a case for controversy, focusing on who the plaintiff was and who the defendant was, which is what's critical for standing as opposed to the merits, it was a suit by the United States to tell a private company not to disclose information. All right, but to the extent you're distinguishing that case on factual and contextual grounds, Raines talks about having the proper party. Now, here we have a different party in the nature of the committee than we do – than was before the court in Raines. So the committee has been authorized by the full House. Doesn't that change your analysis necessarily? So I think you're exactly right, Your Honor, that neither AT&T nor Raines is on factual all fours. And so then the question becomes, what about the reasoning of these cases? That's what I'm focusing on. And so I'll say two things. AT&T has no reasoning. It has a single sentence with no explanation. Raines has three pages of reasoning about why interbranch disputes – And they're not talking about individual congressmen. They say suits between one or both houses of Congress and the president. They talk about how the president never sued over the Line Item Veto Act. They talk about how Congress never sued over a pocket veto. So while it is certainly true that the facts of Raines involve individual congressmen, the reasoning of Raines goes far broader.  But I hear you arguing this morning for an absolute rule that it really doesn't matter who the plaintiff is. It could be the full Congress as opposed to just one house. Right, because the reasoning of Raines is that interbranch disputes, disputes between one political branch and another political branch over their institutional providence with no private party to be seen anywhere. So go back to what the framers had in mind in having three branches of government. The hypothetical, obviously, is where one branch, arguably, is stymied in its ability to carry out a constitutional duty. There is no remedy available under our constitutional system other than at the ballot box. There's no judicial remedy. I'll say two things about that, Your Honor. The first is, for Your Honor, to Justice Souter's concurrence in Raines, which is directly on point for this, where he emphasizes that these sort of interbranch disputes are far afield from the traditional cases or controversies. True, true, but that's not the same as saying it's an absolute bar to any such judicial remedy. Your Honor, I do think that the reasoning of Raines says that that is an absolute bar, that federal courts exist to resolve disputes concerning the rights of private parties. So deal with my hypothetical. So the answer to your hypothetical, the second part of what I was going to say, is that this court in Campbell v. Clinton addressed this question and said, it's not that there are no remedies, it's that there are political remedies. When you have a dispute between the political branches, that is resolved through political tools. And the House has powerful tools. Such as? So the House has powerful tools to block appropriations, to block legislation. If the Senate agrees with the House, they can block nominations, they can affirmatively pass legislation. The Senate and the House together, Congress... And they can make it the grounds for impeachment, for obstruction of Congress. So Campbell v. Clinton did talk about impeachment being one of the tools that Congress has. I'm not going to get into whether on any given fact pattern that would be proper or not, but it is certainly one of the tools that Congress has. Congress has powerful, powerful tools to check the presidency. And that's what the courts have routinely recognized. If anything, Congress is a more powerful branch. But what Congress has never done, until very recently, is instead of using its political tools, instead of using its power of the person, the power of the legislature... Senate Select Committee is the first case we have, isn't it? 1974. So it's the first case. I think that's right with one very important exception. In 1928, the Reid decision that we talked about in the Supreme Court, a Senate committee did try to sue to enforce a subpoena. And it did so pursuant to a Senate resolution that said it could not only issue the subpoena, but take any steps necessary. And the Supreme Court held that that was not authorization to sue.  The Supreme Court held that there was a wide divergence between the power to issue a subpoena and the power to sue to enforce it. That is just exactly the reason why they don't have the sort of injury that supports our complete standing. It goes to the broader separation of power principle. Can I ask you about your claim of absolute testimonial immunity? The Supreme Court has repeatedly rejected the president's claim of absolute testimonial immunity. How is this case different from the instances in which this court has rejected it? So I'm not sure what instances you're referring to. So that case, A, did not involve testimonial immunity. It involved a document production. And B, it did not involve a congressional subpoena. It involved a judicial subpoena, both of which are very significant differences. But I'm happy to talk more about the narrative. There are several other threshold jurisdictional points that I would like to address before the merits. I just want to ask you on standing. Yes. Your position is no one has standing. So the broadest formulation of our argument would be that Congress, when it's asserting its institutional product, is never outstanding. But the narrower version, and it's all that's necessary to resolve this case, is say at a minimum not wanting an interbranch dispute. That's what I'm talking about. In an interbranch dispute, no one has standing. That is our position. To enforce the subpoena. No one has standing to enforce the subpoena in this court. That is our position, Your Honor. We think it follows from Raines. And I think as a matter of separation of powers, that's true for two very important reasons. One, it's a shifting of power from the executive to the legislature. And two, and probably more importantly, it is a radical change to this court's role and one that poses real danger to this court. So on the first, I'll be brief because we've largely talked about it, which is, as we said in our briefs, Buckley v. Valeo makes clear that the power to file lawsuits on behalf of the United States vindicating public rights is vested in the executive, not the legislature. And Buckley talks about this. It explains that the Federal Election Commission, if all it was doing was obtaining information, that might have been okay. And it actually states in the Green the case about the congressional right to obtain information. But then what it says is the FEC had more power than that. The FEC had the power to bring lawsuits. And they said that that is no part of the legislative role, and that's why the Supreme Court in Buckley struck down the original FEC. And the flip side of that is Congress has never had the authority to file lawsuits, and that was the discussion we had about Lee and Green. I'd like to make one last point outstanding, which is the role of the courts. And this is a point that Justice Souter made very eloquently in this concern, which is the reason it matters that this is an interbranch dispute rather than a dispute involving private rights is because federal courts historically existed to adjudicate private rights. And if you instead have them resolving a purely political dispute, a dispute between the political branches, it risks politicizing the court and undermining public confidence in the court. And I can't think of a better case to explain that than the facts of this case. The House Committee in this case has cited our legal position, our merits position, as evidence of why the president has engaged in obstruction of justice and should be impeached. If this court rules on merits one way or the other, you can be assured that the opinion that this court issues will be waived on the floor of the Senate by one side or the other as evidence that either the president is guilty or the president is innocent. That is exactly the problem that Justice Souter and the majority of agents worried about. But that can happen in any litigation, and you know that as well as I. I do, and what Justice Souter said about exactly that point, Your Honor, is it is certainly true that the federal courts will sometimes have to adjudicate deeply controversial issues, deeply political issues, but at least when it does it in the context of a private person's rights, when it's protecting private parties from the government, from other private parties, that is the traditional rule of federal courts, and the public understands that that is the rule of federal courts. When instead you have a political food fight and you've got Congress on the one side and the executive on the other side and the judiciary in the middle picking and choosing who the winners are, that is not the traditional rule of the federal courts, and that is when the public might wonder why, with all respect, unelected, unaccountable judges are deciding who wins a political fight. We know that happens when the Supreme Court rules that somebody is controversial. I did. My only point is it's a matter of necessity in those cases. And yet what is traditional is not necessarily a definition of the total authority. All I can say, Your Honor, is that Reins does say quite clearly that in addition to having a concrete injury, it has to be the type of dispute that is traditionally resolved in federal courts. It has a lengthy discussion of how these types of disputes between the House, not just members of Congress, but the House. But we and the Supreme Court have made it clear that opinions of the court, the Supreme Court, must be read in context of what was particularly at issue and what the holding of the court was. And the rationale and the reasoning and the explication may go beyond that, as we all know. So that's why I started out with my hypothetical, and your response to Judge Henderson makes it perfectly clear there are no circumstances in the Department of Justice's view when this type of matter, enforcing a subpoena in order to carry out a constitutional duty, is properly in the court. So, to the contrary, Your Honor, I think this court has a long line of cases that recognize that it will not be bound, not just by the strict holdings and precise facts of Supreme Court opinions, but carefully considered language of the Supreme Court will be treated as a court opinion, even if it's dicta. The three pages in Reins can't possibly be characterized as dicta. It is essential to the role, and it is essential to Justice Seibert's compliance, and the idea that this court would say none of that matters and all Reins stands for is this narrow factual proposition. No, we don't have to say that. Well, otherwise they have no affirmative basis to have standing unless you say that the rationale of Reins is tabbed to individual members. Haven't we already recognized the power of Reins and Chenoweth? Right. Haven't we recognized that Reins does affect our prior approach to legislative standing, our creative approach back in the battle days? Right, and what it has done is reject every single attempt by federal legislators to bring a case to Congress, again, Chenoweth and Campbell. It has never confronted this precise issue of what Reins and implications are for the full body rather than individual legislators, but what I'm saying is that the reasoning of Reins, there are three pages of that opinion that are not talking about individual legislators. Can I ask you about the marriage now? Sure, I do have subject matter questions, but I'm happy to answer them. Okay, so you've been riding the Reins horse pretty strongly, pretty gallantly, right? Reins tells us that history matters a great deal in these separation of powers issues. Well, the Engel Memorandum from the Department of Justice, the Office of Legal Counsel, says the first example of this absolute testimony of immunity, that's where I'm going, is in 1944. That's 150 years after the founding. Why should we elevate this late stage innovation to the point of constitutional law? History may help you on your Article III standing argument, and that's all you would need to reveal, but if we disagreed with you on that, history hurts you on your testimony. Exactly to the contrary, Your Honor. It is true that the first written opinion describing this might be that they don't have any historical examples of Congress subpoenaing the President or his close advisors and those individuals testifying under compulsion, as opposed to choosing to testify. Of course, the give-and-take between the political branches has always been... Has there ever been an instance of such a broad-scale defiance of a congressional request for information in history of the Republic? Has there ever been anything like this? Your Honor, I think that that question, with all due respect, underscores exactly why there are real dangers with this Court getting into the merits of the case. What's the answer to the question? I don't want to fight with the counter-questions to the premise, but there's a big dispute about whether this is a wide-scale massive resistance or whether one is... Wait, wait, wait. An instruction has been given from the President of the United States not to cooperate in any form or fashion with an inquiry. Has that ever happened before? Not directly to one individual who occupies a particular position. Those are the cases you've been talking about before, but everyone through the administration. Has that ever happened before? Not to my knowledge. No, it hasn't. I think what the President would say in response to that, Your Honor, has never before in history has Congress engaged in the sort of illegitimate inquiries they're doing. I don't want to get into that fight precisely because that is exactly the sort of political dispute that this Court should not be engaging. This Court should not be refereeing who's right or wrong about whether the President is acting totally unusually or Congress is acting totally unusually. That is exactly why this Court should stay out of the merits of this case. But that's the way you want to characterize the issue. There is a more limited way to characterize the issue that my hypothetical tried to point out. In other words, legal questions come before courts that may have collateral political consequences where members on both sides use the Court's decision to support their position. That's a different issue, though. This Court doesn't have to decide the merits of the impeachment inquiry in order to decide whether or not it has a proper party before it and that party has all the other jurisdictional requirements. In terms of simply what I'll describe, and I know you'll challenge this, a procedural matter of enforcing a subpoena for not only testimony but documents. No, there's no documents in this case, Your Honor. Materially. It's only testimony. The parties have resolved their dispute over documents. All the case is about testimony. So all the documents, including the grand jury transcripts and other matters and related to— Those are other cases, Your Honor, in this case. In this case, the McGann case that we're arguing right now. Well, I don't want to bring in matters outside the record, but we all know there are materials that have not been produced. Yes, I'm not disputing that, Your Honor. All right, so this is still a law issue. Yes, perhaps, just not in this case. No, in this case. Their subpoena in this case is for testimony about the McGann. It's not for anything else. If I could address the jurisdictional subpoena, Your Honor, I have a question I haven't had a chance to. I think, as we've been discussing, I think, at a minimum, the standing questions are serious constitutional questions here, given that there are three pages of reigns that support us. And so then the question is, can you avoid that serious constitutional question? I think there's an easy way to do so here, because Congress itself has addressed the circumstances where congressional committees can sue to enforce subpoenas. It has authorized Senate committees to do so, but only in certain circumstances. It has carved out precisely this sort of subpoena against executive branch officials and has not authorized the House to sue at all. I just do not think you can read that statute as allowing the House to circumvent it and to end run all the careful restrictions that are in 1365. And if I could just expand on that for a moment. But why don't you respond to the committee's response to that argument about their statutory exclusion? So I'm not quite sure, to be honest, which of two different points they're making, so I'll respond to both. So at times they seem to suggest that 1365 doesn't displace 1331 at all, that you can always just invoke 1331. That, I think, is a complete non-starter, because the way 1365 is set up, in order to invoke it, the Senate first has to get full resolution from the Senate, including through a committee process. But why is it just belts and suspenders? You've got 1331, there was a question about the amount of controversy, the Senate was unsure, so they just went ahead and did this. Because it's not belts and suspenders. There are limits. There are careful limits in statute. There are limits about when the Senate is authorized to sue. There are limits about where they can sue. They can only sue in EDC. There are limits on the remedies that can be offered. There's only civil contempt, not criminal contempt. If you take their position, they can end on all of that. The House Judiciary Committee could go without going through the committee process. They could file a suit not in EDC. Well, the House could. 1365 is set up by the Senate. So, again, there are two steps. You can take the Senate. On their view today, now that there's no amounts of controversy requirement, the Senate presumably could invoke 1331, not go through the committee process, not file a suit in EDC, seek criminal contempt, and just say, oh, I have 1331. All those limitations in 1365 are very nice, but we're not going to comply with any of them. That is just not a plausible reading of the statute. And if there were any doubt about it, and I didn't have a chance to put this into the brief, Your Honor, and I apologize, but this is the bipartisan statement of the sponsors of the 1996 amendment to 1365, Senator Specter and Levin. If I could just briefly read it. The citation is 142, congressional record 19-412 and 413. So this is Senator Specter. He's talking about 1365. The intent is to make it clear that judicial enforcement is available when a person is asserting a privilege personal to him or her, but not when the person is asserting a governmental privilege available only to the executive branch. The purpose is to keep disputes between the executive and legislative branches out of the courtroom. Here's Senator Levin on the same point. Section 1365 generally authorizes judicial enforcement of a Senate subpoena, except when a subpoena has been issued to an executive branch official acting in his or her official capacity, an exception that seeks to keep inter-branch disputes out of the courtroom. There is simply no doubt that Congress did not want the Senate to be able to end wrongly careful limitations in that statute and file suit under 1331. And I think they largely agree because ultimately where they fall back on is the point that this is about the Senate, not about the House. And that, I think, just holds even less water, because the notion that when Congress gave the Senate limited authority to sue and gave the House no authority to sue, that somehow means that the House has more authority to sue, turns the statute on its head. And if there are any doubts about it, the conclusive reputation of it is this court in 1981. It's the application for permanent investigation of subpoenas. It's the case we cited in our briefs. This court said that prior to 1978, prior to the 1365 statute being enacted, Congress had only two means to enforce its subpoenas. It could ask the executive to bring criminal contempt, or it can invoke its own inherent civil contempt. That's exactly, by the way, what the Senate report says. The Senate report that are also cited in our briefs, if you look at page 16 of that Senate report, when it talks about the need for the statute, it says the exact same thing, that there were only two means of enforcing it. Their argument that somehow lurking in the background, unbeknownst to everyone, was this floating grant of jurisdiction and cause of action under 1331, just has no support. That it's just not how anyone in Congress thought these statutes worked together. And at a minimum, at a minimum, it is unclear. Does your argument signal that we should look forward to future discussions with the Justice Department about legislative history? A new day has arrived? We think it is clear on the faces of the statute, Your Honor, that what Congress was trying to do was carve off these suits, and their suggestion that there was some other mythical purpose is belied by the legislative history. But the only point I was making was, at a minimum, there's ambiguity here. And if there's ambiguity about whether there's statutory jurisdiction to begin with, and there's a serious constitutional question about whether it would be permissible, what this court should do as a matter of constitutional avoidance and judicial restraint is to hold that they don't have statutory authority to sue. And then what is the result? The result is that if Congress wants to sue, Congress can pass a statute. And if ever there was a party who can't complain about being forced to ask Congress to pass legislation, it is the House Judiciary Committee. They are part of the Congress. If they have political support to authorize the lawsuit, they can pass a statute. Page 2. That's exactly right, Your Honor. That is a feature, not a bug. The Supreme Court has made clear that the point of bicameralism in presenting is precisely to prevent the one House of Congress from acting rationally. Yes, but you're listing remedies that require cooperation. And the whole thesis of presenting to the court is, this is total non-cooperation, and the court has to stay out of it. My point is, there are serious Article III questions about whether the House should be able to sue. And before this court resolves those, and before the House Committee can force this court to resolve them, at a minimum, Congress as a whole should actually want this court to resolve them. And there's a good reason to that, by the way, Your Honor, and over and above judicial restraint. There are good reasons. Would 1365 be constitutional if it didn't have the exception for governmental privileges? So again, Your Honor, the broadest version of our argument is whether or not they're suing an interbranch dispute or a private party, we don't think they have Article III standing. We think it is particularly clear that they don't have Article III standing if they're suing the executive branch in a purely interbranch dispute. But the point I was going to make was, the reason why this matters, it's not just a matter of... Maybe you can answer it, and I missed it. Would 1365 be constitutional? I'm trying to understand your reading of 1365. So this is a hypothetical question, I realize that. But if 1365 did not have the exception for governmental privileges... It would be more unconstitutional. It would be more unconstitutional. More unconstitutional than what? Than what it is right now, which is it only allows them to sue private parties. So it's not an interbranch dispute, but you still have the point that... I'm sorry, so you think it's unconstitutional as it is? Yes, because it's still an institutional injury. It's not a private right. But the last point I'll make on jurisdiction was just to say, it's not just a matter of judicial restraint. It's also a matter of, there are good reasons why Congress as a whole might want to not allow these sorts of disputes. And it ties into our Article III standing point, which is, right now disputes over information are resolved through the give and take of the political process. You go back and forth, and there's accommodations, and all that is resolved between the branches. That will all vanish if they have authority to file suits, because then the courts will resolve them, and their resolutions will bind for all time. And moreover... And that's not quite right. I mean, 1365 has been around for quite a while, and I have some personal experience with the statute, and lots of accommodations were made over executive privilege. No, see, that's the critical point, Your Honor. 1365, because it bars out the executive branch, they don't have the ability to lawsuit over executive branch disputes. That's why they continue to be resolved in the political branch. That's Senate Respect and Senate 11. So that's why, in my hypothetical, it takes that language out and makes it worse, right? And this isn't just some hypothetical. The day after the district court in this case rules, the day after, they immediately file another lawsuit over a different set of subpoenas. If this court authorizes standing and cause of action and starts adjudicating the merits of inter-branch disputes over information, it will never end. There will be case after case after case, and this court will be in the business of resolving disputes between the branches over information. It won't be good for the courts, and it frankly won't be good for either of the political branches, because sometimes the House will lose some of those cases, and then they will have less power than they had before. That is why it makes it... That is why Senate Respect and Senate 11 quite reasonably said, we want to keep these disputes out of the courts and keep them within the political branches. That is the separation of powers law that underlies all of this. Of course, there may be another motivation to that view of the Senators, but I won't go there. I will note it was bipartisan, Your Honor. There's Senator Specter and... But they're Senators. Yes. But they're individuals in the Senate's power to keep the courts out.  Yes, that's my point. That is exactly my point, Your Honor. But I'm saying the motivation may be affected by that. I think it well may be their point. The whole point is they're political actors, and they want to have... But Judge Griffith keeps trying to push you to this constitutional question before us, and you want to come back to this, and that's all I'm saying is the Department now is picking out its friends in legislative history. Look, Your Honor, I think my only point is not on the face of the statute that cars off disputes against the executive branch. I think that is for good and sensible reasons, and I think that legislative history confirms those good and sensible reasons that you don't want courts resolving these political issues. My final point is on cause of action, Your Honor, which is simply that even if you don't think that the statute actually displaces their jurisdiction, at a minimum they have to actually have an affirmative ability to sue, and they have said that their affirmative ability to sue is an implied cause of action in equity, and there are two fundamental problems with that. The first is we know from the Supreme Court's decision in Grupo Mexicano that implied cause of action in equity has to be traditionally justified, and they have no history of a suit by a congressional committee to enforce a subpoena. In fact, the Supreme Court in the Reeves decision said that there's a wide divergence between the ability of the suit to enforce a subpoena and the ability to issue the subpoena, so they just can't meet the strong requirement for equity. And then the second is Congress is essentially, even if you don't think Congress has displaced jurisdiction, Congress's decision to pass a statute that creates carefully limited causes of action for the Senate, surely this Court should invent a cause of action for the House. At a minimum, again, Congress should have to speak on this before this Court is thrust into the middle of these sort of political disputes. Your Honor, I'm well over my time. I'm happy to sit down. I've got a question for you. It may be pedestrian. I asked you about does anybody have standing. You said no. The lawyer in me has wondered from the beginning why there's no attorney-client privilege in this case, and you may be waiting until either the separation of powers sweeps it or you're waiting until the questions are asked and he can deny or refuse to answer based on attorney-client. But just like you answered my question, no one has standing. Is it your position that this goes to the, and I don't mean lowest in the sense that any federal employee is low, but the most menial type of employee? I know 1365 talks not only about officers but employees. So it depends which aspect of our argument you're asking about, Your Honor. Our standing and our jurisdictional and our cause of action arguments, all of those apply to all executive branch officers. There's no basis for distinguishing. Our merits argument, if the court reaches it, which we don't think it should, that is very much not. It is very much limited to the close advisors to the President, those who function basically as alter ego. But I didn't think you even mentioned attorney-client and the merits. Well, we have a threshold argument, which is that they can't subpoena the close advisor of the President at all. I understand. But if the court were to disagree and if Mr. McGann were to have to testify, of course, many of the questions, if not the predominance of the questions they would ask him, he would have a whole, not just attorney-client, but a bunch of executive privilege-based objections to the concrete questions. But we're not even at that point, Your Honor, because we don't think they have the authority to subpoena him at all, and we don't think they have the authority to suit and enforce that. Well, again, the lawyer in me says, don't minimize attorney-client privilege. There are no further questions, Your Honor. I appreciate the time. We'll give you some time to reply. Ms. Barbaro? May I please support Megan Barbaro on behalf of the Judiciary Committee of the U.S. House of Representatives? Your Honor, the Department invokes separation of powers principles to argue that the committee does not have the right to come to court to seek enforcement of its valid subpoena, as would every other party that issues a subpoena. And they invoke separation of powers arguments, but if this Court were to hold that the committee cannot get a judicial remedy to obtain the information it seeks in exercising its Article I authorities, that would shift the balance of power significantly in favor of the executive branch. And would we, the President, be able to... What about the remedies that your friend discussed? Congress has plenty of remedies. Appropriations power, confirmation power, impeachment power. There are lots of remedies that have been used for a long time. What's wrong with those? Your Honor, the injury here is a deprivation of information to which the committee is entitled in exercising its impeachment and other Article I functions. It is true that the House has other remedies available to it, but as OLC recognized in 1984 and 1986, those other remedies are not effective in obtaining a remedy for this specific injury, that is, getting information in a timely fashion that the committee can use for its urgent priorities. I have a threshold question for you, if I might. Even if we were to agree with you that the President's claim to absolute testimony immunity in this case is extravagant, I wonder why we should be involved in this dispute at all, given the President's posture. By what authority are you now pressing this appeal? Are you here to protect the legislative oversight authority of the House Judiciary Committee, or are you here because of the impeachment? Because arguably, our analysis of an immunity claim would differ based on whether you're here wearing the legislative oversight hat or whether you're wearing the impeachment hat. The articles of impeachment are all about the controversy over Ukraine. McGahn was long gone from the White House by then. He's a witness to possible obstruction of justice by the President, but the House has chosen not to press that matter. The only possible relevance McGahn would have to the impeachment is if you're here to tell me that the House may yet approve another article of impeachment. Is that the position of the committee and the Speaker, that there may yet be another article of impeachment to which Mr. McGahn's testimony would be pertinent? Your Honor, there's a lot in that question, and I want to make sure that I answer all of it. The short answer to the first part of the question is that we are here pursuing this case both for the legislative and oversight purposes, and we all agree that the case does not move because of those priorities that the committee has, but we are also here... But if you're only here on legislative oversight, we wouldn't have spent the holidays on an expedited basis, right? You're here because of the impeachment, so... That is correct, and we remain here because of the impeachment, and I want to be very careful about how I answer the question in terms of the committee's continuing interest in testimony from Mr. McGahn for the impeachment purposes, and also then walk through how it's relevant to the existing articles of impeachment and the ongoing investigation. And if we could turn, in our supplemental brief on page 7, the committee laid out the position of the committee as blessed by the House, that McGahn's testimony remains central to the committee's ongoing investigation into the President's obstructive conduct, and if his testimony produces new evidence supporting the conclusion that President Trump committed impeachable offenses that are not covered by the existing articles, the committee will proceed accordingly, including, if necessary, by considering whether to recommend additional articles. So you're saying there may be new articles of impeachment coming? Could be. That's a possibility. The two that we have, you're saying... And you're saying this on the authority of the Speaker? You have authority to say this from the Speaker of the House, that there may be yet other articles of impeachment coming? Your Honor, I am here saying exactly what we said in our supplemental brief, which was said with the full authority of the House, which is, and just taking a step back as a matter of first principles, the fact that the President has been impeached by the House on two articles does not mean that the House could not, if Mr. McGahn testifies and there's additional relevant evidence of misconduct, use that information both, and we can get to how that's relevant to the existing articles, for its decision-making with respect to how to proceed in the current impeachment, for any trial in the Senate for which that evidence is relevant, and also, as we said in the supplemental brief, for considering whether to recommend additional articles. Mr. McGahn's possible testimony is only relevant in the impeachment trial with the present articles of impeachment. How? How is it? He was gone. The two articles are all about the Ukraine controversy. He's gone from the White House by then. Your Honor, the second article of impeachment relates to obstruction of Congress, and if we look, this is House Resolution 755. Obstruction of Congress in the Ukraine controversy. That's correct with respect to the specific misconduct in that article, but the article also refers to the President's previous efforts to undermine federal governmental investigations into foreign interference in the United States elections, and as the committee made clear in its report, that that pattern of misconduct is relevant to consideration of this second article, including whether the remedy of removal is the appropriate remedy, and that's outlined, as we detailed in our brief, in the Judiciary Committee report that accompanied these articles of impeachment. And in addition, of course, if McGahn came in to testify, and he was, as we've laid out, an eyewitness to several of the allegations of the President's misconduct and interference. So it's a pattern of practice argument you would be making, right? It is the pattern of misconduct that would be relevant, and again, that is information that the Judiciary Committee is continuing to pursue. That is part of why we have pressed this appeal, asked this court to move expeditiously, because that information would be relevant to the committee and leaders in the House in making decisions about how to proceed, and that remains true, given the current state of affairs with the articles of impeachment. And regardless, again, we are here for both those impeachment purposes and also because the committee from the outset has been considering important remedial legislation, including to govern interactions between the White House and DOJ and the FBI, including to govern foreign offers of contributions to political action committees and individuals in upcoming elections. Those are legislative priorities that are also time-sensitive. We have expedited, for example, the Mazars appeal, which was not an impeachment subpoena, but was based on legislative and oversight priorities. And for all those reasons, we urge the court to rule expeditiously. I have a just technical question. We heard counsel from again say that the subpoena only seeks testimony. I read both the complaint and the subpoena talking about testimony and evidence, talking about creating a false record. I read that to be more than oral testimony. Am I correct, or did the committee, as counsel argued this morning, only seek McGahn's testimony, oral testimony? Your Honor, you are correct that the subpoena sought both Mr. McGahn's testimony and related documents, all of which the schedules attached to the subpoena. Now, we did reach an agreement with the department with respect to the documents. I'm not sure the status of that production, but that the document aspect of this, as the district court noted, is no longer the issue in the appeal. It's related to having McGahn appear and testify and provide testimonial evidence. Well, you reached agreement. Was it a stipulation that the committee would not seek any other documents? Were the testimony to reveal the likelihood of other documents relevant to that testimony? I don't know. That's what I'm trying to understand. The short answer is no. I believe that it was an accommodation such that they would produce the documents that had been sought. All right. I won't pursue this, but I mean the record speaks for itself. I don't know what the terms of this private agreement, not private, but accommodation was. I do. There was significant discussion of the Raines case, and I would like to start there with respect to standing, because we do fundamentally disagree about the meaning and import of the Raines decision. And the holding in that case, as the Supreme Court has made clear in later cases, is that individual legislators, and in that case it was six members of Congress who had lost the vote on an act, did not have standing. That is, they did not have a concrete and particularized injury to assert an institutional interest in the dilution of legislative power, which was an interest that belonged to Congress as a whole. What do you do with your friend's argument that the reasoning supporting that holding is much broader than you maintain? And the reasoning, we heard several times about the three pages of history that's discussed in Raines, but those historical examples relate to the lack of challenges between the executive and legislative branches about the constitutionality of duly enacted statutes that have been passed through bicameralism and presentment. This is a different criticism. But that's not what the discussion talks about. The discussion talks about the diminution of power is not a basis. Diminution of power by one branch of the government is not a basis for article free standing. The facts of the cases that Chief Justice Rehnquist listed in his parade of horribles may have involved constitutionality of the statute, but the reasoning that the Chief Justice used is broader than that. So tell me about the reasoning. His reasoning talks about diminution of power of a branch of government is not sufficient grounds to satisfy article free standing. That's a problem for you. A few responses, Your Honor. This isn't about the diminution of power of a branch of government. This is a case about a subpoena that the committee issued. The reasoning in Raines is going to court. I thought your whole argument was that the injury that the House Judiciary Committee has suffered is frustrating its ability to carry out its investigation. Isn't it given the power that you say the Constitution gives to it? To clarify, that is a power that is vested in the House and delegated to this committee. This committee is the plaintiff in this case. The question for standing purposes is trying to determine whether the plaintiff is asserting an injury that is a particularized injury to that plaintiff. That is what distinguishes the committee in this case, which has issued a subpoena and is entitled to information in response to that subpoena, from the plaintiffs in Raines who were asserting an interest that belonged to the legislature as a whole. This is a case where the plaintiffs, in the words of the Supreme Court in later cases, there is a match between the plaintiffs and the injury asserted. Raines is about more than just your being injured. There are only certain types of injuries that are justiciable. As I read, as I understand your friend's argument about Raines, I think the Supreme Court says the type of injury to a branch of Congress that diminishes their power, when they come to the courts to say the executive has done something to diminish our power, that that's not the type of dispute that we're supposed to referee. We're not an ombudsman over the operations of government, as I think Justice Frankfurter may have said, he dunced out or something. That that's not our job. A few responses, Your Honor. It is important to return to the particular facts of this case, because the courts have long been adjudicating the validity of subpoenas, including subpoenas directed at the president and senior executive branch officials. That was the case in the United States before that Chief Justice Marshall decided in 1807. Now, I understand there are additional separation of powers concerns and an overlay of an interbranch dispute here. That's a criminal proceeding, right? That is correct. There are criminal proceedings. There are also proceedings where the rights of individuals are at stake, but none, I don't think you have any instances where the institutional interest of the Congress has been injured and, therefore, is cognizable. Well, as this court recently recognized in the Mazars decision, there is a long history that predates the founding of our nation of legislative subpoenas. The Mazars is a subpoena to a non-governmental actor, right? The accountant firm. As I understand your friend's argument, I don't mean to make it formal, I'm using this to get your response to it, is that this isn't, unlike what the district court said, this isn't a garden variety subpoena enforcement. This is a dispute over information between two political branches of government. It's a very different sort of creature than the typical subpoena enforcement. And in that respect, it's very much like this court's decision in AT&T, which this court understood to be an interbranch dispute. That was a case where a House subcommittee had subpoenaed AT&T for records relating to an FBI- But why are AT&T and Senate Select Committee, and it comes back to the argument about Reins, if we read Reins narrowly, as you urge us to do, then it seems to me that AT&T and Senate Select Committee have some force that we need to account for. If your friend is right, that Reins is broader than that, then AT&T and Senate Select Committee are suspect. They are from a day when this court engaged in some expeditious ventures into legislative standing, though, as I said, jokingly, for the bad old days, it didn't change. Isn't that right? Isn't that the issue? The issue is, if we agree with you that Reins should be read narrowly, then AT&T and Senate Select Committee may tell us there is standing here. If we disagree with you, and we say that what Reins was really about, the reasoning of Reins, was to warn us against getting involved, just as Souter said in his concurrence, getting involved in these disputes, then you lose. If I could push back on the premise of the question, we are not advocating a narrow reading of Reins. We are advocating a reading of Reins that is consistent with the holding in that case, which is in the last paragraph of the opinion, is also consistent with the reasoning, which relates to different types of interbranch disputes, and the lack of a history about disputes over the constitutionality of an active statute. The question in Reins was whether the plaintiff was the correct plaintiff to assert the injury, and that is the question in every Article III standing case. The Supreme Court has characterized Reins that way in its later decisions. We know it matters that it was individual legislators at issue in Reins, and nothing about Reins overrules this Court's very clear holding in AP&T. Does it chenoweth suggest that it does? Chenoweth was a case about, again, members asserting an amorphous dilution of legislative power. This is, again, I keep going back to this, but it matters here, that this is a subpoena enforcement case. This is the type of dispute that the courts are very familiar with answering, and even if there are political questions at issue in this case, as we know from the Supreme Court's decision in the top sheet, even if there are political issues the courts would gladly avoid, it is the duty of the court in a case that is otherwise justiciable, and we've submitted that this one clearly is consistent with this Court's precedent and a long history of practice between the branches, to stay with the law. That is what we are asking the court to do, is to issue a ruling that Mr. McGann, who again, he is a private citizen, he's a former presidential aide, to the extent the concern is that this dispute is not sufficiently particularized because there are not individual rights at issue. The committee has subpoenaed a private citizen to appear and testify and provide relevant evidence. He's in many respects similar to AT&T in that respect. The executive has asserted an absolute immunity defense that is unfounded in the law, and we are asking the court to resolve that issue so that the committee can expeditiously obtain the information it needs in response to the subpoena. Now I'd like to talk as well, unless there are further questions I'm understanding, about subject matter jurisdiction and going to the plain language of Section 1331, which makes it very clear that there is jurisdiction over the committee's suit in this case, which arises under the Constitution and laws of the United States, as this Court said in AT&T in 1976. Their argument is essentially an implied repeal argument. To the extent they're looking at legislative history or other factors, we know that the courts disfavor implied repeals, particularly in the jurisdictional context. Nothing about 1365 repeals jurisdiction for House subpoenas under 1331 because, of course, 1365 deals only with Senate subpoenas, and whatever limitations are in 1365 with respect to the Senate are neither here nor there with respect to whether the House has jurisdiction and continues to have jurisdiction, under this Court's reasoning in AT&T, over House subpoena enforcement actions. If there are questions about 1365, I'm happy to address those, but otherwise I'll just briefly say that there is... What do you do with your friend's argument based on legislative history, the statements of Senator Specter and Senator Munger? Your Honor, in 1996, the Senate was attempting to clarify 1365 with respect to a specific issue that had arisen for executive branch officials to assert its personal privileges to make clear that those were covered by 1365 and there was jurisdiction. To the extent there are statements by individual Senators in the legislative history about what that clarifying amendment meant, again, that doesn't have anything to do with House subpoena enforcement disputes, and any limitations that the Senate understood might be imposed by 1365. Certainly, there's no basis for imposing those on the House, particularly where what the Department is asking is that this Court recognize an implied repeal of a jurisdictional grant over jurisdiction over House subpoenas, and those are certainly disfavored, and any ambiguous legislative history is not enough to overcome the burden that they would have to meet to find the 1365 strip jurisdiction that would otherwise exist under 1331. My point, Congress is part of government too. This is just the Department of Justice's argument in support of McGahn's position. Correct. Instead of the government. I admit, I tried to catch myself when I went. I had previously worked at the Department of Justice. I'm still in that habit, but I'm adjusting to my new role, so I apologize for misspeaking. On the cause of action question, two points there. One, my friend on the other side mentioned Grupo Mexicano. That case is about a very different circumstance, where the question was whether a court sitting in equity could exercise jurisdictions that had historically not existed at all over real property before there had been a judgment. The facts are very specific. The holding is very specific in that case. So as I understand the Department's argument here is, and maybe I'm putting words in counsel's mouth, but he's willing to acknowledge that these cases may be distinguishable on factual grounds. But I understand his argument to be that the court in Raines and elsewhere basically was laying down a path for the court to be very wary of entering this type of dispute. And it gave the reasons why. And so to the extent Raines signals that to the court, almost saying don't try it because here's what's going to happen if you do, then the question, it seems to me, is where Raines says, well, there may be factors that work nevertheless in favor of the courts entering this area. And when we look at those factors, such as the history of what's been going on, counsel makes the point you can't find anything like this. And, of course, Judge Griffith's question points out, well, maybe there's never been a situation like this because in the past the Department of Justice, the President, and the Attorney General have not interposed objections to supplying information to the committee. I think that's the hurdle that we're trying to address here because there are fine arguments. And I realize that courts can evolve. But nevertheless, Raines is a fairly broad statement. And it says it doesn't close the door completely. I don't need it to close the door completely to the extent the Department is arguing this morning. But it's very strong language, isn't it? And we can parse these cases to distinguish precisely who the plaintiff is and that type of thing. And to that extent, the committee can argue, well, it's an open question before this court and it's an open question if and when the case goes to the Supreme Court. But that's the response we're trying to get from you. A few responses, Jenna. One, with respect to the question of how this has worked between the branches, I would direct the court to page 48 of our brief where we point to a number of examples where, contrary to what the Department has said, legislative subpoenas were issued to senior members of the executive branch, including White House counsel and former White House counsel, who appeared and testified under a subpoena. Voluntarily, as I understand the Department's position. Voluntarily in the sense that we didn't have to bring a court action to get a judicial judgment requiring them to comply with a valid congressional subpoena. But isn't that the whole point of your friend's argument? That you didn't have to do that and you got it. And that in the place of a court coming in and picking a winner or a loser, the nation's history has been negotiation, compromise, accommodation. It's messy. It takes time. It involves all these tools that you can't use in the court. But that's what the separation of powers means. Isn't that his very point? And we would have been happy to have reached an accommodation in this case because it would have meant that Mr. McGann would have already shown up and testified and provided the information. Cut the appropriations. Cut the appropriations. Stop. Get the Senate to stop confirming judges. Make it an article of impeachment. You're not without remedy here. The question is whether you, whether the Constitution allows you to pull the courts, and I'm just channeling Justice Souter's encouragement, whether the Constitution allows you to pull the courts into this dispute that historically has been fought out, duked out between the political branches. That's to me the tough question. And what Reigns has to say about that. Right. And I understand the concern. The fact that there are other remedies that would be available to Congress, I think really underscores that Congress has the power, the Supreme Court has long recognized this power, there's no dispute, to issue subpoenas and obtain compliance with those subpoenas. We have come to this court seeking an orderly, effective resolution of this dispute, including about a core legal question on absolute immunity, that is the type of legal question that the court has answered in the past, that is traditionally judiciable, capable of judicial resolution. It's been answered in our favor and against the government's favor every time an analogous claim has been raised. Notwithstanding that, we are in a situation now where there has been an unprecedented refusal to issue valid congressional subpoenas, and the committee is continuing in an attempt to exercise its constitutional functions and do its job under Article I to obtain orderly resolution of this dispute. And that is why we are here. And the core questions in this case are questions that the court is well positioned to resolve. They relate to whether Mr. McGann, a former aide and private citizen, is required to comply with a congressional subpoena. And just so I understand, so if we were to affirm the district court, what happens then? Mr. McGann shows up before the committee, he's sworn in, he's asked questions, and then he interposes objections, right? That is what we would expect. And what happens then? He says, I can't speak because you're a close aide to the president, there's executive privilege. What happens then? I mean, one option, of course, is that if this court were to rule in our favor and reject the absolute immunity defense, that we could reopen the discussion with the department about the appropriate way. What happens in my hypothetical? He comes and he invokes executive privilege. The president has not invoked executive privilege with respect to Mr. McGann. What happens if he does? My hypothetical is that he does. Right. And as the district court made clear in her opinion, those questions, while teed up in our complaint, have not been resolved by this opinion. We're not asking the court for a resolution here. And any executive privilege claim that was valid and asserted, again, as we've argued in the brief, is another reason to reject the absolute immunity defense if he doesn't come in and testify at all. But what happens next? He comes in, he asserts executive privilege. What happens next? There would be, well, we would, if you were the Senate, you couldn't come here. If you're the Senate, you couldn't come here to get a resolution that disputed. But you're not the Senate, you're the house. You argue that. And we expect consistent with our complaint in the papers, we found in the district court that we would go back to the district court for a resolution of those questions, if and when they were teed up. But again, if this court were to rule in our favor, we would expect to reopen the accommodations process and hopefully reach a And just one final point I wanted to make, if I may, which is the imbalance in terms of the argument here, particularly on standing, that a committee of the house exercising its Article I authorities, unlike every other litigant who issues a subpoena, and unlike what I understand the Department of Justice would do if Mr. McGann actually said he would appear and testify, I expect that they would, as they have done in other cases, relating to our subpoenas, that they would go to court to seek to prevent him from doing that. And in their view, they would have subject matter jurisdiction and a cause of action and standing to do that, but they would like to keep the judiciary committee out of court from getting a court determination on the same question about the same subpoena. Are there no further questions? All right. Thank you. Does Mr. McGann have any time? All right, why don't you take three minutes. I appreciate that, Your Honor. I'll try to squeeze three points in three minutes. On standing, my friend basically wants this court to read Reins narrowly to its facts and ignore its reasoning, but read AT&T broadly and rely on its lack of reasoning. As we talked about, we agree, the facts of Reins are a case involving individual members, but the reasoning goes much more broadly. And I don't think that we heard any explanation of why that reasoning doesn't apply here. There was some suggestion that there's, you know, information is somehow obviously an injury. Well, take, for example, the examples that were given in Reins. Of course, the Tenure of Office Act interfering with the ability of an executive to fire their subordinate would clearly be an injury if it was imposed on a private party. If Congress told a private CEO he couldn't fire a subordinate, of course that CEO could sue. And, of course, the legal question was susceptible to resolution had won back in Clinton. What did all of the work in Reins, all of the work, was the fact that it was the chief executive, it was the president, not some private party. Conversely, they emphasize that this is information that Congress needs. Well, the point is, as Judge Griffith emphasized, they need the information in furtherance of their legislative prerogatives. It is only, as Reins said, an interest of official authority or power. Well, let me give a very stark and simple example to show why they're wrong about this. Imagine if someone was stealing property out of Congress, just going in and stealing computers. They couldn't file a lawsuit to stop that. They couldn't file a conversion action or a criminal action. What they would have to do is come to the executive branch and ask the Department of Justice to file those lawsuits. And why? Because under our Constitution, the ability to file lawsuits on behalf of the United States and indicate the injuries to the government is vested in the executive. That's the square rolling of Buckley v. Malayo, is that the problem was there that the FEC, staffed by members of the legislature, has the ability to bring enforcement action. So it's not some sort of oddity that they need to rely on the executive branch to bring lawsuits. That is how the structure works. And the way it works is through political process, through the political tools. If they're not happy with how the executive branch is complying with its obligations of bringing lawsuits, they have political tools, ample tools, over legislation and appropriations and nominations and all the rest. Just like the executive branch, if we're not happy with the subpoenas they're issuing, we have our tools. What you don't have is federal courts stepping in the middle of that political food fight because that politicizes the judiciary. The second point and the last point I'll make is- Can I just be clear then? Is your view that the opinions of the Office of Legal Counsel that these alternative remedies were not adequate in this context? It's no longer the law? I'm not quite sure what you're referring to. I mean, you can't just pass legislation on a unilateral, unicameral basis. So the notion that the Senate at this stage is going to go along with some of these things, I mean, it's nice to write a law review article about, but the reality of the world is we have two branches at loggerheads here. And the question really is, the fundamental question, we have two branches of government. Is there no proper role for the courts? And your answer is no, not in this type of dispute. Either they have to duke it out or nothing happens. And the fact that one branch and one part of a branch is stymied in what the founding fathers thought was a critical power in terms of checking abuse of presidential power. And here the allegation is made that that is what happened. We have yet to have a trial on that. But that's so fundamental to the form of government we have. And as you know, the Justice Department has previously taken the position that the courts have no role when the president is exercising certain Article II powers. And the Supreme Court has said, no, no, there is a role. All right? It may be a limited role, but there is a role. And that's what I think we're struggling with here. I'll get your argument. But if we don't have a case on all fours, then you're saying constitutional avoidance. You have the message from the Supreme Court. So I'll say a couple things in response to that, Your Honor. First is bicameralism and resentment is a feature, not a bug, of our constitutional system. I think Campbell v. Clinton recognizes that. No, no, no, no, no, no. I mean, you can't pass an act of Congress without two houses. That's my point. You hear it? Yes. The fact that their political tools require effort and require accommodation within the branches and across the branches, that's the whole point of our constitutional system. No, no, no, but I'm getting at the point that we're at the point now where there is no such cooperation in our constitutional system. Let me give an example this way. It was identified as a fundamental need for this government to continue to operate effectively. Just like, Your Honor, Congress has very conveniently carved themselves out of FOIA. And there's nothing the executive branch can do about that other than put political pressure on them. We can't just pass a law that says, You know what? Congress is subject to FOIA now. That's how the political process works. The political branches use whatever tools they have, and if they don't have enough tools because they don't have enough political support in the Senate and in the public, that's how it works, and that's what Campbell v. Clinton recognized. If I could just make one last point on jurisdiction, which is, my friend said that it's just, if you look at 1331, it's clear that they could file a lawsuit, and so this is an implied repeal case. Well, it wasn't so clear to the D.C. Circuit in 1981. This is from the application case that I cited to you earlier. Prior to 1978, Congress had only two means of enforcing compliance with its subpoenas, a statutory criminal contempt mechanism and the inherent congressional contempt power. Nor was it clear to Congress when it passed 1365, this is from the Senate report, need for civil enforcement of subpoenas. Presently, Congress can seek to enforce a subpoena only by loose criminal proceedings or by the impractical procedure of conducting its own trial before the bar of the House of Representatives or the Senate. It is simply anachronistic for them to suggest that everyone always knew that 1331 was lurking in the background and they can invoke it. There is no history or tradition of it. You can avoid the serious Article III constitutional questions by saying that at a minimum, Congress has to speak, but we do think that Article III says that this is not a proper seat. Thank you, Your Honor.
judges: Henderson, Rogers, Griffith